This case is interesting, well they're all interesting, but this one is particularly interesting because Eni Wajaja, the petitioner, has a case that's virtually identical to her sister Effie Wajaja. The immigration judge, Judge Kane Stockton, denied Eni's case on June 20, 2000. Immigration Judge Koop granted Effie's case on August 21, 2000. There were two different judges. That is correct. You're not trying to persuade us that two different judges have to come to the same result on different cases. Our position, Your Honor, is that you have two virtually identical cases. The Attorney General has a compelling interest to engage in consistent decision-making. In this instance, the judges were in the same immigration court. We gave the BIA, with all respect to the agency. Well, there are differences in the personal circumstances. Well, Your Honor, I think that the For instance, you know, the incidents that happened at work to the sister didn't happen to this petitioner. That's correct, Your Honor, and she testified There are differences in terms of, you know, personal persecution, aren't there? Well, Your Honor, she did testify, of course, on cross-examination that her sister's office was attacked during the May riots of 1998 and that hers was not. She was working at the time as well. That is the only significant difference, however. Counsel, if you made the argument that there was no difference, what's your best case authority for the proposition that two different immigration judges on two different asylum applications must come to the same result if those applications are similar? What's your best case authority for that proposition? Your Honor, we haven't found any with respect to immigration judges. Have you found any with respect to any judges? We haven't, Your Honor, but we did find authority with respect to district director. That's different. That's an administrative adjudication. The district director has regulations that bind the district director. But I'm talking about in terms of exercising judicial functions. Have you found any case that constrains a judicial officer in terms of making rulings vis-à-vis other judicial officers? In the case of initial authority, not in terms of appellate review, but in terms of initial decision-making authority. We have not, Your Honor, but I would like to make this point. You're not arguing that it's compelled, are you? Or are you? We believe that the Attorney General, particularly this instance where the Board of Immigration Appeals saw both cases and one judge said there's not enough evidence to change the result of the first immigration judge, that the Attorney General does have a compelling interest in making sure that there's consistent decision-making in asylum cases. So what can the Attorney General do? Can the Attorney General make the IJ give a consistent ruling? What are you saying? What is your argument exactly? Our argument is where you have virtually identical immigration cases, particularly asylum cases, that there ought to be consistent decision-making. Who has responsibility for that? Who would make sure that happens? Are you saying the Attorney General then should concede the eligibility for asylum of the second? Is that the argument you're making, that the Attorney General misapplied the law? What are you saying? I don't understand your argument. Certainly, Your Honor. We're saying that there ought to be consistent decision-making. But how would that happen? How would that have happened? We brought the matter to the attention of the Board of Immigration Appeals. They had both cases. They had the record, essentially, in both cases. They had FE's application. They had her declaration, which is really the core of her case. So you're saying the Board of Immigration Appeals had the obligation to make those cases consistent. So could the Board of Immigration Appeals then take away the asylum for the sister who had received asylum and said, well, we're going to make them consistent by taking away the asylum for the first sister? That's an excellent point, Judge Rawlinson. And the answer is that she should be granted asylum on the merits of her case. That is, that Annie has enough in the record to be granted asylum in her own right. And so when the BIA has two cases which are compelling, they ought to engage in consistent decision-making. I do want to go back to the ---- Ryan, just Ryan. Yes, Justice Kennedy. I agree with you to this extent. I mean, you know, it is, I think, somewhat problematic that ---- I don't agree here that these are identical cases, but they bear many similarities. You know, somewhat problematic that a different IJ should come to different conclusions. But at the same time, you know, these are discretionary matters. It's an exercise of discretion. And you brought that matter, as you say, to the attention of the BIA through your motion to reopen, right? Yes, we did, Your Honor. Absolutely. And we have to recognize that the decision on that motion to reopen also is a discretionary matter. Now, you know, Judge Rawlinson raises an interesting point. I mean, suppose, suppose, you know, the BIA were to conclude, well, you know, we made a mistake on the sisters application, you should have been denied. That's as logical a possibility as it is to say we made a mistake on this application. So, you know, I don't think we're going to get to that perfect world where things that are similar are similarly treated as a matter of discretion. But, you see, our job is to review whether or not in this case there's an abuse of discretion. And I feel like, Judge Rawlinson, that, you know, you have to show us a case that says, well, if there's another case that's pretty similar where there's a grant, it's an abuse not to grant it here. I just haven't seen that case. Your Honors, if I may, and Judge Estima particularly, if I may respond to a point that Judge Rawlinson brought up earlier, which was, well, these cases, but as a matter of fact, the Asylum Office is normally the first level review. So if the Asylum Office were making disparate decisions on virtually identical cases, one would be able to raise that issue there as well. We cite Del Mundo v. Rosenberg, which is a Central District, California case decided in 1972. And in that case there were, I'm sorry for the editing on page 26 of the brief, but the issue there was whether two virtually identical applications for stay of deportation could be decided differently. And the Central District ruled that they could not and that, in fact, the district director had abused his discretion in ruling in two completely different fashions in these particular cases dealing with a stay of deportation. That's a pretty specific circumstance, though, wasn't it, in that case? Yes, Your Honor. That's why we cite it, because this is a very specific circumstance. Well, this is talked about in terms of the United States Armed Forces and the effect of the ruling on the service person's ability to come into the United States. That was a really odd circumstance. Well, it's certainly an interesting fact pattern. But the bottom line is Judge Hawk in his decision on page 348 says the obvious identity between the Reyes case, where the woman was granted to stay, and the instant case, that is Del Mundo's case, is immediately apparent. And the only difference really in those two cases was that Ms. Del Mundo, I think, had been married for four days when she applied for the stay of application, and Ms. Reyes had been married for four months. And that was the only difference that the district judge found. Well, the court in that case talked about how the morale of the service person would be undermined because their orders were to stay here in the United States and they didn't want to separate the family. So I see that as a lot different than the circumstance we're confronting today. Well, Your Honor, it does say in the decision that where there are similarly situated, this is on page 349, that the director's concerns in that case were subsumed because the cases involved similarly situated aliens, quote-unquote. Anything else disrupts the consistency and uniformity he, the district director, must maintain in his decisions to guarantee equal protection of the laws and is arbitrary, capricious and unreasonable. We believe that that holding applies to this case. Thank you. Could I ask a question? Yes, Judge. I don't think it affects the decision, but I'm just curious. Because the petitioner now has a sister who's been granted. So is she eligible for I don't know what's called an adjustment of status? Yes, Your Honor. So some kind of she is eligible. The law is that five years after the grant, she is eligible to apply for lawful permanent residency. And it takes about a year or so. Well, actually, it would take longer because of the refugee visa numbers. Effie, who is here in the courtroom today, she's among the last. So what about the petitioner? How does that affect the petitioner? Well, unfortunately, the backlog for sibling petitions is very, very long, eight, nine, ten years. So thank you. Yes, Your Honor. Thank you, Judge. Thank you. May it please the Court. Isaac Campbell for the government in this matter. Your Honor, because this is a consolidated case, I'd like to first address the board's affirmance of their denial of petitioner's claim for asylum and her claims on torture against convention and then address the motion to reopen. In looking first at the board's affirmance of the immigration court's denial, the record evidence does not compel the conclusion that petitioner was persecuted, excuse me, based upon any of the five enumerated grounds. The petitioner provided two examples of purported persecution allegedly based on her ethnicity. She stated that on May 12, 1998, during the citywide riots, she was in a car with her sister when two individuals banged on a car window. You can find that at the administrative record at 151 and 746. She stated that she was able to speed away without incident. On August 16, 1999, she stated that she was approached at a red light by an individual who attempted to clean her windshield and demanded some money for those services. In the first case, the two incidents that she describes do not rise to the level of persecution. Secondly, even if those incidents did rise to the level of persecution, because she was, one, accosted with someone banging on a window, and secondly, when someone asked her for money after cleaning the windshield, she provides no evidence that it was motivated on account of her ethnicity. She also claims that the purported persecution during the riots of her, and she mentioned there were some other incidents that happened with her relatives, somehow constitutes pattern and practice of persecution. However, this court has held that evidence of general conditions of strife is insufficient by itself to establish a clear probability of persecution. Moreover, the petitioner concedes that the ethnic Chinese or those of Chinese ancestry weren't the only group to suffer during the riots. The petitioner herself admits that even native Indonesians and Muslims had property damage, and you can find that in the administrative record at 155. Well, yeah, but they weren't targeted in the same way. I mean, you have a riot, lots of people get hurt. Lots of property gets destroyed. Certainly. But from all of these cases, I mean, it's clear that the Chinese were targeted as an ethnic group during those riots, isn't it? I think in fighting a direct response to your question, just putting it in context, certainly no one is saying the conditions are ideal. However, the question is whether, I think the relevant question is whether or not the, what happened, whether they were targeted, and that constitutes a sufficient enough pattern in practice that it qualifies for asylum, and we'd argue that it does not. And secondly, at this level, whether or not the record compels such a finding, we would argue that it does not. We also note that petitioner provides no examples of alleged persecution based upon her religion. She doesn't offer anything and said she was directly persecuted, and there's some question about that. So there's no record evidence to compel the conclusion that. Well, you know, we always go back to the record. It's expensive to compile a record that would show this kind of pattern in practice. But at some point, don't we have to just look at reality? I think in that case, first of all, looking at whether or not it's a pattern of practice, there has to be some, as this Court has asked, there has to be some application to the individual. And she does not make any allegations at all that says, you know, well, this happened to me in this way. But petitioner herself does not make that allegation. There's also no reasonable fear of future persecution. Again, the pertinent issue is whether or not the record evidence compels such a conclusion. In this case, the State Department Country Condition Report states that Indonesia is making significant progress in this transition. Would you want to go back there? It's making progress, but it has a long way to go. Certainly, and no one's making the argument that, again, this is an ideal spot, and certainly not arguing that everything is paradise and sunny and wonderful. But the question isn't whether or not it is as good or as nice, or whatever term you would choose to use in the United States. The question is, does it rise, the question is, is what's going on warrant a finding of eligibility for asylum? Is it so terrible? And is there some type of persecution based on these enumerated grounds that warrants eligibility? So while it's not saying that it's an ideal country, by no stretch of the imagination. Are you really arguing that this person has no reasonable fear of being attacked again because of her ethnic, ethnicity? Can you really argue that? We're making the argument that. I know what you're saying about the past persecution and all of that, but can you really argue that she has no reasonable fear of future persecution? I would argue, in response to that, I would argue the regular evidence does not show that she has both a subjective and objective fear sufficient enough to warrant eligibility. I know what you're saying about the record, but just. . . In terms of whether or not she is. . . But isn't it just, doesn't the record show in this case and other cases overwhelmingly that there is still an ethnic, there's going to be some ethnic conflict in Indonesia? I would argue that in this record it is not as strong as in other records. And not looking at other records, I would also argue that while I can't make any assertion that she would not be harassed under any circumstances, but neither can the other side make that she would not be harassed ever. The question is not whether or not she would face any incidents of any harassment whatsoever. It doesn't rise to that level. The question is whether or not it rises to the level that warrants asylum. So I'm not suggesting that it is an ideal or wonderful country, that she would never face any type of harassment on any level ever. But I don't think that's the relevant question before the court, whether or not she would have some ideal condition to go back to. I don't know. Okay. Could you please, before your time responds, respond to the assertion that because the petitioner was similarly situated to her sister, that she should have been granted asylum? I would say, first of all, petitioner's counsel argues that it is virtually identical in that the only difference, which the petitioner did concede in her testimony, is that one sister's office was attacked and the other wasn't. I would argue that there are several distinctions. First, looking at in the motion to reopen, petitioner provided a declaration by the sister. And at the administrative record at 51 and 52, she intimated that after she took a taxi ride, that she intimated there were threats by the taxi driver specific to her during the riots. She stated at the administrative record at page 54 that she was stopped and purportedly robbed by Indonesian soldiers. So we're not even talking about rioting and whether or not the government could protect them. But these were soldiers, she claimed, that actually robbed her. She is also, she states that she has a different religious belief. She states that she is a Christian, whereas in this case the petitioner states she is a Buddhist. What point are you making about the soldiers? Isn't that a supporter? This is the sister. Oh, the sister. These are the differences. Right. I'm just saying, exactly. Oh, and there's nothing like that here. I see. And secondly, and lastly, there's no evidence regarding what was revealed during the sister's evidentiary hearing. Now, that's important because in the instant case, for example, it was only during the testimony in the instant matter that evidence regarding an incident on August 16th in which she said she was approached at a red light and someone demanded money, that only came out during the evidentiary hearing. So there's also no record evidence to show if there was anything that came out in her sister's case as well. So there are several distinctions. And in this case, it is not one where petitioner can argue they are virtually identical and therefore warrants the same. If we disagree with you and we say they are virtually identical, what's your response to the argument that if they're virtually identical, the outcome should be the same? Even if that were true, which we're clearly saying that it's not, we would argue that it still does not necessarily warrant a similar outcome. There are, in looking at extremes, there may be cases where, for example, asylum eligibility is clearly mandated because the facts are so overwhelming or some extremes where it clearly isn't. And then there's another area in which one would have to examine the issues and because the administrative judges were there, it's not clear what was said during the testimony, how it was presented, that it is not appropriate, that a reasonable fact finder can look at the circumstances and perhaps come to different conclusions, and that it is only at this stage whether or not the facts compel only one particular outcome that would warrant. Yeah, I understand that. You, there was a, Judge Tashima had a colloquy with Mr. Ryan about her eligibility for an adjustment of status based upon the sister's residence that would come about way down the road. Can you comment on that? What is the significance? What does the sister, what would affect her eligibility to apply for it? With the sister having received the grant of asylum, I'm not sure of the exact timeline, but at a certain point, if she becomes a legal permanent resident, then I'm not even sure if the sister can apply. I know at that point I'm not sure if, I believe she's unmarried, she's an unmarried sister, but I don't know all the particulars of the sister's case to be able to give you a specific answer and say this is, she could definitely apply. It does seem from the facts that down the line she may be able to apply some sort of derivative claim to her sister, but there would need to be certain circumstances, which I'm not sure are present in this case. And you agree that it's taking the district directors, it's taking a long time to process those sibling applications? I don't know if I would agree with the specific timeframe that Brethren Counsel alluded to. But years. Yes, it can take a while. Okay. Thank you. Thank you, Otis. Thank you. At a minimum, they're certainly similarly situated, and to the extent that Effie's claim reinforces the fact that they are similarly situated, it is pattern or practice evidence which supports the petitioner's claim. There was reference to the question of religion. I'm sorry. I guess I was misreading the time. Am I over? Yes. I'm sorry. You are. I apologize. I'm sorry, Judge. Thank you. Thank you. The case I just argued is submitted for decision. And we'll hear the next case, which is Hermawan v. Ashcroft. Certainly.
judges: Schroeder, Tashima Rawlinson